UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

CRIMINAL NO. 05-80955

vs.                                                    HON. DAVID M. LAWSON

DEMETRIUS FLENORY,

     Defendant.

_____/

### United States' Response Opposing
### the Defendant's Motion for Compassionate Release
### or, alternatively, Request or Recommendation for Home Confinement

For nearly 15 years Demetrius Flenory reigned over one of the most notorious drug trafficking organizations in this district's history. While at the helm of the Black Mafia Family ("BMF"), Flenory negotiated and saw through the purchase of massive quantities of cocaine on the West Coast and in Texas, arranged for the transport to the Detroit area and over ten other cities in the United States, and conspired to launder millions of dollars of the proceeds from BMF's cocaine sales.

Following his arrest and prosecution, Flenory eventually pleaded guilty to continuing criminal enterprise and money laundering and was sentenced to concurrent sentences of 360 months and 240 months, respectively.  Sixty-four other members and associates charged in this district were convicted of drug and money laundering conspiracies, while numerous other BMF members were

1

convicted in multiple other districts.

Flenory began serving his sentences on September 12, 2008. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A), the Court to order that his sentence be reduced to time served or in the alternative, the Court order that he serve the remainder of his sentence in home confinement or the Court to issue a recommendation that the Bureau of Prisons grant him home confinement. His motion should be denied.

*First*, the Bureau of Prisons is already evaluating and releasing inmates most at risk from the COVID-19 pandemic. Following two recent directives from the Attorney General, the Bureau of Prisons is urgently assessing its entire prison population to determine which inmates face the most risk from COVID-19, pose the least danger to public safety, and can safely be granted home confinement. As of April 30, 2020 these directives have already resulted in at least 1,871 inmates being placed on home confinement. *See* BOP COVID-19 Website. This process necessarily requires the Bureau of Prisons to prioritize the most pressing cases— identifying the best candidates for release, ensuring that their homes are suitable for home confinement, and arranging a way to quarantine each of them for 14 days. Flenory should not be permitted to throw a wrench in that ongoing process by petitioning the Court, particularly given the absence of any judicial authority to direct or review the Bureau of Prisons' home-confinement decisions.

2

*Second*, Flenory does not qualify for compassionate release. Because Flenory only just sought compassionate release from the Bureau of Prisons based on COVID-19, as required under 18 U.S.C. § 3582(c)(1)(A), on April 20, 2020, the Court does not have jurisdiction to address his COVID-19-based argument until he exhausts his administrative remedies. Nor, in any event, do Flenory's characteristics qualify him for compassionate release under that statute. At 51, Flenory is not in the age group that makes him at a higher risk, and his health issues are stable.

## Background

Having begun his drug career selling $50 rocks of crack cocaine on the streets of the city of Ecorse, Michigan in the late 1980's, by the time Flenory, his brother, Terry Flenory and hundreds of other members of BMF were indicted in 2005, Flenory's enterprise had distributed massive quantities of cocaine on the streets of Detroit, Atlanta, St. Louis, Birmingham, Alabama, Los Angeles and numerous other cities. From the millions in proceeds generated from sales, Flenory amassed considerable wealth and assets. And he used that wealth and those accoutrements to live like and gain access to the rich and famous, and further promote his illegal activities under the guise of a music production company known as BMF Entertainment. BMF Entertainment was nothing more than a front for and promotion of Flenory's drug trafficking activities.

After previously facing mandatory life in prison due to the large scale quantities of cocaine BMF distributed under Flenory's leadership and the over $21 million dollars in assets the government seized, on November 19, 2007, Flenory pleaded guilty to one count of continuing criminal enterprise and one count of money laundering conspiracy. Flenory has numerous contacts with law enforcement. Prior to his arrest on this case, he had been arrested 12 times on charges which include drugs, weapons, and assaultive offenses. Defendant has a 1988 felony offense for possession of cocaine which was disposed of via the Holmes Youthful Trainee Act; a 1990 felony conviction for carrying a concealed weapon; and a 2000 misdemeanor conviction for driving under the influence. In addition to the indictment in this case, he had three other pending charges: murder, forgery/giving a false name to police and felon in possession of a firearm. Flenory has been arrested on charges involving firearms on four occasions. He has been arrested on drug charges four times. The murder charge in Atlanta, Georgia is still pending. (Exhibit 1).

Based on his criminal history, Flenory scored in criminal history category II. (PSR¶ 18). At 38, he had no employment history at any point in his adult life. He claimed to have earned no income from his ownership of BMF Entertainment or his part-ownership of Juice Magazine. (PSR ¶¶ 63, 64). This is because neither of these entities generated funds legally. They were sourced from proceeds of Flenory's drug enterprise.

Judge Cohn sentenced Flenory to concurrent sentences of 360 months in prison on the continuing criminal enterprise offense and 240 months on the money laundering offense.   At sentencing, Judge Cohn gave the same rationale for the identical sentences he imposed on both brothers– [b]y my understanding of the conspiracy, it's gone on for over 10 years, maybe 15 years, and I think you are a very lucky man that it took the government that long to finally put it together." *See* Doc.#1101 PgID 6319; Doc#1162, PgID 6799.

Flenory began serving his prison sentence on September 12, 2008, and is currently incarcerated at FCI Sheridan in Oregon. He is 51 years old, and his projected release date is October 30, 2031. His only underlying medical conditions are hypertension (benign essential), hyperlipidemia, esophageal reflux, low back pain, all of which are under treatment by prescription drugs and are stable. *See* Exhibit 2 and Exhibit 3, Medical Records (sealed). Nevertheless, Flenory has moved for compassionate release, citing his medical conditions and the COVID-19 pandemic. Flenory has made this request despite being only at the very beginning of the administrative process with the Bureau of Prisons.  Although his attorney mailed a letter to Sheridan on April 17, 2020, Warden Josias Salazar did not receive that request until April 20, 2020, a mere two days before Flenory filed his motion with this Court.  *See* Exhibit 4.   Alternatively, Flenory moves this Court to order that he

serve the remainder of his sentence in home confinement or the Court to issue a recommendation that the Bureau of Prisons grant him home confinement.

**Argument**

I.   **Federal prisoners are already being considered for home confinement during the COVID-19 pandemic, and Flenory should not be permitted to cut in line over more vulnerable ones.**

A.   **The Bureau of Prisons has new authority to place federal prisoners in home confinement.**

The Bureau of Prisons is already increasing the placement of federal prisoners in home confinement based on COVID-19, and its authority to do so has now been expanded. Previously, 18 U.S.C. § 3624(c)(2) authorized the Bureau of Prisons "to place a prisoner in home confinement" only "for the shorter of 10 percent of the term of imprisonment . . . or 6 months." *Id.* But new legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement." Coronavirus Aid, Relief, and Economic Security Act (CARES Act), § 12003(b)(2), Pub. Law 116-136, 134 Stat 281, 516 (Mar. 27, 2020).

In addition, the Attorney General has recently issued two directives to the Bureau of Prisons, making the finding that triggers the increased statutory authority under § 3624(c)(2) and ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." (03-26-2020 Directive to BOP, at 1

6

(attached as Exhibit A); 04-03-2020 Directive to BOP, at 1 (attached as Exhibit B)). The Attorney General's directives remind the Bureau of Prisons to consider "the statutory requirements for home confinement." (03-26-2020 Directive to BOP, at 1). These statutory requirements include the requirements in 18 U.S.C. § 3624(c) and (g) for home confinement in general, as well as the requirements in 34 U.S.C. § 60541(g) for some elderly and terminally ill offenders.

The directives also require the Bureau of Prisons to identify the inmates most at risk from COVID-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1). And the directives instruct the Bureau of Prisons to consider "*all* at-risk inmates—not only those who were previously eligible for transfer" into home confinement. (04-03-2020 Directive to BOP, at 2 (emphasis added)).

In evaluating each inmate under these new directives, the Bureau of Prisons must balance at least four general considerations:

1.) The inmate's age and vulnerability to COVID-19;

2.) Whether home confinement would actually decrease the inmate's risk of contracting COVID-19;

3.) Whether the inmate is at one of the facilities most affected by COVID-19; and

7

4.) Whether the inmate's release into home confinement would risk public

safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). Evaluating the inmate's risk to the public requires assessing not only the inmate's crime of conviction, but also his criminal history, the resources and security level of his prison facility, his proposed home-confinement location, his disciplinary record in prison, and his risk of recidivism. (03-26-2020 Directive to BOP).

Those criteria make sense. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of prisoners, en masse, on the public at large. (04-03-2020 Directive to BOP, at 2–3). That is true in normal times, and it is particularly true given the strain on our first responders right now. As recent news reports have confirmed, a significant percentage of local law enforcement in many cities has either contracted COVID-19 or been placed under quarantine. Officers who remain on the job are stretched to their limits. Domestic violence is on the rise. Shootings and murders are increasing. *See [Detroit cops fight violence spike, social distancing violations with depleted manpower](), Detroit News (Apr. 8, 2020)*. And innovative criminals are taking advantage of the public's desperation by perpetrating new types of crime—including COVID-19-based fraud schemes. There are real risks to public safety right now, and those risks will only increase if communities are faced with a sudden influx of prison inmates. That is just one

8

reason, among many, why the Bureau of Prisons must focus on releasing inmates who are the most vulnerable to COVID-19 and whose release will least endanger public safety.

Another reason is the dilemma that everyone will face if an incorrigible inmate is granted home confinement and then either violates his home-confinement conditions or commits additional crimes. The home-confinement statutes permit— and in some instances, require—the Bureau of Prisons to revoke home confinement and re-incarcerate an inmate if he reoffends. 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). This means that if an inmate is released and then commits a serious crime, the Bureau of Prisons and the justice system will face a difficult choice: either (i) violate the statute, permit the inmate to remain free, and give him de facto authorization to continue harming the public as much as he pleases, or (ii) return the inmate to custody and risk him bringing COVID-19 back into the prison system, placing other inmates at risk. That is all the more reason to get the initial release decision right, and it is why the Bureau of Prisons must carefully consider whether an inmate should be granted home confinement.

    **B.**     **Even if Flenory is eligible for home confinement, he should not be permitted to cut in front of other inmates for consideration by the Bureau of Prisons.**

Flenory might or might not be granted home confinement under the new legislation and Attorney General's directives. But either way, he should not be

9

permitted to push his way in the queue past other inmates who are less dangerous and more vulnerable than he is. At age 51, Flenory is not elderly, and he is therefore not at higher risk from COVID-19 because of his age. Flenory points to his hypertension and "heart issues," as medical conditions that put him at a high risk for developing severe complications were he to contract COVID-19. However, Flenory's medical records do not reflect any diseases currently affecting his heart. And he does not provide any particularized medical determination that his personal risk of a severe case of COVID-19 is heightened. According to BOP, Flenory's medical conditions include hypertension (benign essential), hyperlipidemia, esophageal reflux, and low back pain, as of March 30, 2020. (*See* Exhibit 3, pg. 1) (sealed). And all of these conditions are in treatment through a standard drug regimen. Flenory has four active prescriptions, two of which require daily ingestion. He takes one 25 mg tablet of hydrochlorothiazide for his hypertension and two 40 mg of atorvastatin for his hyperlipidemia daily. Flenory takes two other medications as needed for acid reflux and another for low back pain. And contrary to Flenory's claim otherwise, his prescriptions have been timely administered during the COVID pandemic. As of April 24, 2020, in 26 days, he has received 41 tablets of his hypertension medication and 82 tablets of the medication he takes for his high cholesterol. (*See* Exhibit 5, Medication Summary) (sealed). In addition, his other two medications have been dispensed to him in a manner sufficient to satisfy his

medical needs should he require them for pain or complications from acid reflux as needed. Because of the novelty of the coronavirus that causes COVID-19, and the fact that Flenory has provided no information concerning an evaluation of whether his particular medical ailments heighten his risk of a more severe case were he to contract the virus, it is simply unknown whether Flenory is more at risk of a severe case than other inmates, or more at risk in an institutional setting, rather than in the community. And even assuming Flenory's medical conditions increase his risk, there are undoubtedly other inmates whose medical conditions are more serious and who are more at risk from COVID-19—and whose evaluation and potential release should take priority over Flenory's. Flenory should not be permitted to cut in front of those other, more vulnerable inmates.

Flenory also downplays his record and criminal history, which the Bureau of Prisons must weigh here. Flenory persists in demanding that he is entitled to the same treatment rendered his brother, who BOP has approved for home confinement. Flenory makes this argument despite failing to demonstrate he is entitled to the same treatment at this point. Terry Flenory's assessment by BOP is distinguishable.  Terry Flenory has multiple serious medical conditions recognized by the CDC that place him at a heightened risk of serious complications were he to contract COVID-19. (*See* Exhibit 6 and Exhibit 7).  Moreover, Flenory has served 48 percent of his sentence, while Terry Flenory has served over 60 percent. (*See* Exhibit 8 and Exhibit

9). Terry Flenory also has a lower risk of recidivism based on his BOP Pattern score, a prisoner assessment tool used to target estimated risk and need.  And Terry Flenory has behaved better while in prison. (Exhibit 10).  Conversely, over the course of his incarceration, Flenory has lost a combined 135 days of Good Conduct Credit for various serious disciplinary violations, some of which resulted in 6 months in solitary confinement.  (Exhibit 11)

Rather than recognizing that this Court must make an individualized assessment on sentencing matters, Flenory attempted to advance a similar argument for identical treatment when he pursued a two-level reduction under United States Sentencing Guidelines Amendment 782 last year.  Like here, and despite having a higher criminal history category that resulted in a higher guidelines range than his brother's, Flenory still insisted that his attorney pursue the lower guidelines range attributable to his brother.  Although the government was willing and had stipulated to the two-level reduction to amend his accurate guidelines range from 360 months to life to 324 months to 405 months, rather than to the 292 months to 365 months guidelines range for his brother, Flenory directed his attorney to withdraw his motion. Flenory and his brother's respective assessments were not identical then, nor are they now.

Moreover, given the circumstances of Flenory's offense and his continued notoriety as a drug baron, it is also questionable whether he would abide by the terms

of home confinement—much less adhere to the CDC's social-distancing protocols. Flenory was the leader of a long term, widespread drug conspiracy, and he flaunted that everywhere he went before he was convicted and still now, even while in prison. He has participated in interviews and other promotional activities carried out by his family and friends, including by his young son. One look at several of Flenory's son's music videos make clear that BMF, and Flenory's drug dealing legacy, lives on through his son. The videos make repeated references to Flenory and BMF. They epitomize BMF videos of years past and the lifestyle as was best described by Flenory himself in a 2005 promotional video for BMF Entertainment. In it, Flenory claimed that BMF had invested $500,000 to one million dollars in this single artist, [a BMF member indicted in Atlanta] and it can do that because ["BMF"] **already** has all the "money, cars, houses, clothes, jewelry and ho's." Flenory's son's videos prominently feature all these things, while Flenory's young son is depicted wearing and displaying BMF paraphernalia engulfed in plumes of marijuana smoke throughout. Flenory relishes the attention and notoriety he receives from those who strive to be like him, a professional drug dealer. Many drug trafficking organizations have claimed an association with BMF due in large measure to Flenory's flamboyant and extravagant lifestyle. In his mind, he, more so than his brother, is the face of BMF, and undeniably, many would probably agree. Flenory would do nothing to destroy the street credibility he continues to enjoy to this day. Rather, he would, as

he does now, do everything he could to further promote it. And that is influence that would further erode the black community and other communities if he were released, contrary to Flenory's feigned commitment to positively impact "Detroit and the black communit[ies]" everywhere with his sheer presence alone. So it is at least questionable whether Flenory would cease engaging in serious criminal conduct.

Given Flenory's record, it is also questionable whether he would abide by the terms of home confinement—much less adhere to the CDC's social-distancing protocols or the Governor's stay-at-home order. Time and again, Flenory has been unwilling to follow even far more basic societal norms. Why would anyone think that he would follow social-distancing protocols or a stay-at-home order? Because Flenory would be unlikely to remain in home confinement or take those COVID-19 restrictions seriously, he would also be far more likely than other members of the public to contract COVID-19—perhaps even more likely than he would be in prison—and would also be more likely to spread it to other people. But again, that risk to the public, whatever it may be, is one of the factors that the Bureau of Prisons must evaluate in determining whether Flenory should be granted home confinement.

Further, even if the Bureau of Prisons were inclined to release Flenory into home confinement, it must first ensure that any home-confinement location is suitable for release, does not place him at an even greater risk of contracting COVID-19, and does not place members of the public at risk from him. (03-26-2020

14

Directive to BOP; 04-03-2020 Directive to BOP). Although the Bureau of Prisons is expediting that process—particularly at the facilities most affected by COVID-19—it cannot happen overnight; nor can it handle every potentially eligible inmate simultaneously. The Bureau of Prisons should therefore be permitted to prioritize the inmates who are least dangerous to the public and most vulnerable to COVID-19. And Flenory should not be permitted to interfere with that process just by petitioning the Court. *See Wolff v. McDonnell*, 418 U.S. 539, 566 (1974) (cautioning that courts "should not be too ready to exercise oversight and put aside the judgment of prison administrators").

The Bureau of Prisons is also working around the clock to protect any inmates who are not eligible for discretionary release. Inmates at every institution, including FCI Sheridan, are being protected by a new shelter-in-place protocol (https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp) to decrease the spread of the virus. Even prior to the national lockdown, the Bureau of Prisons had already instituted a number of precautionary measures to reduce the risk of infection. A full run-down of those measures is available on the Bureau of Prisons' COVID-19 Action Plan website (https://www.bop.gov/coronavirus/). Although no plan is perfect, these measures will help federal inmates remain protected from COVID-19 and ensure that they receive any required medical care during these difficult times.

**C.    The Bureau of Prisons' decisions are not subject to judicial review—much less preemptively.**

In any event, there is no jurisdiction for the Court to order home confinement or to review the Bureau of Prisons' decisions on which inmates are, or are not, granted home confinement. Neither § 3624(c) nor § 60541(g) contains any provision for judicial review. So to the extent Flenory asks this Court to order his release into home confinement, his motion must be dismissed for lack of jurisdiction. *See United States v. Garza*, 2020 WL 1485782 (S.D. Cal. Mar. 27, 2020) (recognizing that "the Court lacks authority to designate home confinement"); *United States v. Brown*, 2020 WL 1479129, at *1 (D. Md. Mar. 26, 2020) ("It is inherently the authority of the Bureau of Prisons to transfer an inmate to home confinement, pursuant to 18 U.S.C. § 3624(c)."); *see also United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons.").

That is especially true here, because Flenory is seeking release from this Court *before* permitting the Bureau of Prisons to evaluate whether he is a good candidate for home confinement. Even in other contexts, when limited judicial review of prison administration is appropriate, inmates are required to exhaust their administrative remedies before challenging "events or conditions relating to their custody." *Little v. Hopkins*, 638 F.2d 953, 953 (6th Cir. 1981). There is no basis for Flenory to preempt that administrative process here—particularly given that judicial review of

16

any home confinement decisions is not permitted at all. Flenory, in short, is asking for relief in the wrong forum.

### D. The Court should decline Flenory's request for a recommendation that he be granted home confinement.

The Court should also deny Flenory's request for a judicial recommendation to the Bureau of Prisons that he finish his sentence under home confinement. Even assuming the Court has the authority to grant such a recommendation, Flenory is not a strong candidate for it. Flenory is not elderly. His medical conditions are stable, and he has several years left on his sentence of imprisonment. In addition, his risk of recidivism is currently above the level for priority consideration by BOP, and he has served less than half of his sentence. And his continued thirst for fame thus suggests that his release into home confinement would quickly spiral into additional criminal conduct.

## II.    The Court should deny Flenory's motion for compassionate release.

Section 603(b) of the First Step Act of 2018 amended 18 U.S.C. § 3582 to afford inmates the right to seek compassionate release on their own motion, when previously only the Bureau of Prisons' Director could do so. But first, inmates must request compassionate release and exhaust their administrative remedies with the Bureau of Prisons, or wait 30 days in the event the Bureau of Prisons fails to act on their request. 18 U.S.C. § 3582(c)(1)(A). Second, a court may only grant compassionate release based on an individual inmate's "extraordinary and

compelling reasons," which must be consistent with the Sentencing Commission's policy statement and which the inmate has the burden of showing. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13(1)(A), (3); *United States v. Hamilton*, 715 F.3d 328, 327 (11th Cir. 2013). And third, a court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that the inmate "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2).

### A. The Court is barred from granting release because Flenory has not exhausted his administrative remedies.

The Court must dismiss Flenory's motion, because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Before an inmate moves for compassionate release in court, he "must at least ask the Bureau of Prisons[] to do so on [his] behalf and give BOP thirty days to respond." *United States v. Raia*, __ F.3d __, No. 20-1033, at 3 (3d Cir. Apr. 2, 2020) (citing § 3582(c)(1)(A)) (opinion amended on Apr. 8, 2020).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1855–57 (2016). Those requirements may not be excused, even to account for "special circumstances." *Id.* Rather, as a judge in this district recently held, "[t]he text of 18 U.S.C. § 3582(c) defines mandatory conditions precedent to a defendant filing a motion [for compassionate release] under that section." *United States v. Alam*, No. 15-20351, at 4 (E.D. Mich. Apr. 8, 2020).

Flenory has not exhausted his administrative remedies. The warden at Sheridan received Flenory's request for compassionate release due to the risks of COVID-19 on April 20, 2020. BOP has not yet had its 30 days to respond. Flenory has therefore not satisfied § 3582(c)(1)(A)'s mandatory exhaustion requirement.

That failure is fatal to Flenory's claim. As the Third Circuit held recently in denying a similar, unexhausted motion for compassionate release, the COVID-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement. *United States v. Raia*, __ F.3d __, No. 20-1033, at 8 (3d Cir. Apr. 8, 2020) (opinion amended on Apr. 8, 2020). Rather, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.*; *see also United States v. Alam*, No. 15-20351, at 6 (E.D. Mich. Apr. 8, 2020) ("[T]his failure to exhaust cannot be excused, even in light of the COVID-19 pandemic."); *United States v. Eberhart*, No. 13-CR-00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("Because defendant has not satisfied the exhaustion requirement, the court lacks authority to grant relief [based on COVID-19] under § 3582(c)(1)(A)(i)."). Flenory's motion must be denied on that basis alone.

**B.     There are no extraordinary and compelling reasons to grant Flenory compassionate release.**

Even if Flenory had exhausted his administrative remedies, compassionate release would be improper. The First Step Act did not change the substantive requirement that compassionate release be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A); *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020). Nor did Congress remove the directive that the Commission, not the judiciary, adopt the policies regarding "what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(a)(2)(C) & (t).

In that sense, the compassionate-release standard mirrors the identically-worded standard for sentence reductions under 18 U.S.C. § 3582(c)(2) based on retroactive guideline amendments. In both contexts, the Sentencing Commission's policy statements place "hard limit[s] on a court's ability to reduce the sentence." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). And the Supreme Court has upheld those limits under § 3582(c)(2), stressing that "Congress charged the Commission with determining in what circumstances and by what amount the sentences of prisoners affected by Guidelines amendments may be reduced." *Dillon v. United States*, 560 U.S. 817, 830 (2010). So even when an inmate asks a district court to disregard those limits, the Commission's restraints "on a district

court's sentence-reduction authority [are] absolute." *Jackson*, 751 F.3d at 711; *accord United States v. Horn*, 612 F.3d 524, 527–28 (6th Cir. 2010).

For compassionate release, the Sentencing Commission has fulfilled Congress's directive in its policy statement in USSG § 1B1.13. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons." USSG § 1B1.13 cmt. n.1. Unless an inmate's circumstances fall within those categories, he is not eligible for compassionate release. 18 U.S.C. § 3582(c)(1)(A); *Saldana*, 2020 WL 1486892, at *3; *cf. Dillon*, 560 U.S. at 830.

Flenory relies on his medical conditions in seeking release, but he is not eligible for compassionate release on that basis. Flenory's conditions are not terminal, and every indication is that his health is stable. None of his conditions are so severe that they "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." *See* USSG § 1B1.13 cmt. n.1.

Nor is Flenory correct in suggesting that the COVID-19 pandemic should alter this analysis here. At 51 years old, Flenory is not elderly, which places him in a lower risk group were he to develop COVID-19. Flenory notes that he has hypertension and heart issues, but his records only confirm his hypertension, which

is mild and he is stable. Flenory fails to provide any particularized medical determination that his personal risk of a severe case of COVID-19 is heightened such that priority over inmates with more serious underlying medical conditions, which include his brother, is warranted.

Rather, the crux of Flenory's claim is a generalized assertion that he *could* contract COVID-19 and that the virus *could* jeopardize his health, and that the risk of those things happening in prison is greater than the risk of them happening on release. But Flenory sidesteps an important consideration in that analysis: the likelihood that he would *still* contract COVID-19, even if released. COVID-19 is—and will continue to be—widespread among the public for many months. Flenory's prior conduct also shows that he would be unlikely to follow even basic restrictions on release, much less the CDC's social-distancing protocols or the Governor's stay-at-home order. Given this reality, it is hardly clear that Flenory faces a greater risk in prison than he would if released. And in any event, Flenory's speculation on this point is not enough to satisfy § 1B1.13's criteria.

Nor is Flenory eligible for compassionate release based on the "other reasons" category. For this category, the Bureau of Prisons has issued Program Statement 5050.50, which contains standards for eligibility that are related to but somewhat more extensive than the first three categories. Flenory has not shown that he satisfies those standards.

Further, because Congress and the Sentencing Commission have mandated that "other reasons" for eligibility be determined by the Bureau of Prisons, not the judiciary, the Court lacks the authority to grant compassionate release based solely on the general threat posed by the COVID-19 pandemic. *See United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020); *United States v. Lynn*, 2019 WL 3805349, at *4-5 (S.D. Ala. Aug. 13, 2019); *United States v. Shields*, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019); *United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019); *United States v. McGraw*, 2019 WL 2059488, *2 (S.D. Ind. 2019); *United States v. Washington*, 2019 WL 6220984, at *2 (E.D. Ky. Nov. 21, 2019); *United States v. Willis*, 382 F. Supp. 3d 1185, 1187 (D.N.M. 2019); *United States v. Ebbers*, 2020 WL 91399, *4 (S.D.N.Y. Jan. 8, 2020); *United States v. Overcash*, 2019 WL 1472104, at *2 (W.D.N.C. Apr. 3, 2019); *United States v. York*, 2019 WL 3241166, at *4 (E.D. Tenn. July 18, 2019).

Even if that judicial authority existed, the COVID-19 pandemic does not qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, __ F.3d

__, No. 20-1033, at 8 (3d Cir. Apr. 8, 2020) (opinion amended on Apr. 8, 2020). The Bureau of Prisons has worked around the clock to implement precautionary measures reducing the risk from COVID-19 to Flenory and other inmates. And if COVID-19, standing alone, qualified as an "extraordinary and compelling reason[]" for relief, there would be no limiting principle: *every* inmate—no matter his actual risk of contracting COVID-19 in prison, no matter his risk of contracting COVID-19 if released, and no matter his risk of developing complications from COVID-19, either in prison or on release—would be presumptively entitled to relief under § 3582(c)(1)(A). Nothing in the statute or USSG § 1B1.13 supports such an unbounded interpretation. *See Raia*, __ F.3d __, No. 20-1033, at 8. Flenory is not eligible for compassionate release.

### C.   The factors set forth in 18 U.S.C. § 3553(a) also do not support relief.

Even when an inmate is statutorily eligible for a sentence modification based on an "extraordinary and compelling reason," compassionate release is not necessarily appropriate. Before ordering relief, courts must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that the inmate "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). So even if the Court were to find Flenory eligible for compassionate release, the § 3553(a) factors and § 1B1.13(2) should still disqualify him.

Flenory's claim to fame is being the leader of a large scale drug trafficking organization that moved large quantities of cocaine and the cash from their sales across the country.  It purportedly employed over 300 members, 64 of whom were indicted in Detroit with Flenory.  During his time in prison, Flenory continues to promote himself, and, through others his legacy as a highly successful professional drug dealer. Nothing in that promotion remotely suggests that Flenory has changed.

Thus, an analysis of the § 3553(a) factors since Flenory's incarceration is little different today than it was at the time of sentencing.  Even in his pleadings, he maintains the self-importance that he enjoyed while at the helm of BMF. He continues to demonstrate a lack of respect for the law. Therefore, it is highly likely that he will reoffend if he is released from prison at this time.

### Conclusion

Flenory's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney


_s/Dawn N. Ison_
DAWN N. ISON
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9657
E-mail: dawn.ison@usdoj.gov

Dated: May 1, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to:

Wade G. Fink
Attorney for Demetrius Flenory

I further certify that I served a copy of the Government's sealed Exhibits via email to:

Wade G. Fink
Attorney for Demetrius Flenory

*s/Dawn N. Ison*
DAWN N. ISON
Assistant United States Attorney

Dated: May 1, 2020