UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,          Case Number 05-80955
v.                                          Honorable David M. Lawson

DEMETRIOUS FLENORY,

          Defendant.
_____/

## OPINION AND ORDER DENYING WITHOUT PREJUDICE MOTION FOR RESENTECING, RELEASE, OR RECOMMENDATION

In 2008, defendant Demetrious Flenory was sentenced to 30 years in prison for maintaining a continuing criminal enterprise and money laundering. Together with his brother Terry, Flenory led an extensive drug trafficking organization known as the Black Mafia Family (BMF). The brothers each pleaded guilty and received identical sentences. The Bureau of Prisons recently released Terry to home confinement following the guidance issued by the Attorney General under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, 18 U.S.C. 12003(b)(2). Demetrious submitted a request to the BOP for the same treatment about 2.5 weeks ago but has had no response. He now moves for judicial relief. The applicable statute requires prisoners seeking such relief to start by asking the BOP; judicial review only follows a denial or a non-response after 30 days. Although that administrative exhaustion requirement may be waived in rare instances, Flenory has not made a convincing case that this is one of them. Therefore, the Court will deny the motion without prejudice to Flenory renewing it if the BOP does not allow his request for release.

I.

On October 28, 2005, Flenory and 41 others were charged in an indictment with drug related offenses related to the BMF organization. Flenory and his brother, Terry Flenory, were the leaders of the BMF. By the time Flenory and his brother were indicted, their enterprise had distributed massive quantities of cocaine across several states. Flenory and his brother made millions of dollars and mingled with the rich and famous. At its height, the BMF was estimated to employ over 500 people. The brothers also started an entertainment music company, BMF Entertainment, which promoted several hip-hop artists and served as a front organization to conceal evidence of their drug trafficking activity. Even today, BMF remains a well-known name in the community. *See* https://en.wikipedia.org/wiki/Black_Mafia_Family.

Flenory has an extensive criminal history. Prior to his arrest in this case, he had convictions on various drug, weapons, and assaultive offenses. Notably, at the time of the indictment in this case, Flenory had three other pending charges: murder; forgery/giving a false name to police; and felon in possession. The murder charge in Atlanta, Georgia was dismissed with no prosecution of Flenory.

Flenory and his brother both faced life imprisonment if convicted as charged. Eventually, both pleaded guilty under plea agreements to continuing criminal enterprise, in violation of 21 U.S.C. § 848, and conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h). In 2008, Judge Avern Cohn sentenced both Flenory and his brother to 360 months imprisonment, which was the bottom of the applicable sentencing guidelines. Both also agreed to forfeit millions of dollars. Flenory presently is confined in the Bureau of Prisons (BOP) facility at FCI Sheridan in Sheridan, Oregon. To date, there are currently no confirmed or reported cases of COVID-19 at FCI Sheridan, although Flenory does not trust the BOP's reporting.

Flenory is a 51-year-old male. He asserts that he "requires daily medication and chronic care for his hypertension and heart issues" and, "because of his age and underlying health conditions," he is "at high risk for developing severe health complications should he contract COVID-19." Def.'s Mot., ECF No. 1616, PageID.9051. His attorney further asserts that "on information and belief," Flenory "has not received his heart or blood pressure medication in three weeks." *Ibid*. He also says that he has been designated as a Chronic Care Level 2 prisoner.

He states that, if released from prison to home confinement, he could reside in Florida with his son and his son's mother, La Tarra Shanel Eutsey. Flenory also states that several family members and friends in Michigan have offered their homes to use for home confinement. He also points out that he is well-known in the African-American community and hip-hop culture due to his prior role in the BMF. Flenory also assert that, while in prison, he has used his notoriety to effect positive change for African-American youths, including orchestrating charity drives. If released, he intends to continue this mission.

Flenory is scheduled to be released on October 30, 2031. Incarcerated since 2005, he says he has served 62% of his sentence (he has 138 months, or 38%, remaining). However, he says he is entitled to a two-point reduction under the United States Sentencing Guidelines Amendments 782 and 790 and that a motion to that effect is forthcoming. With the two-point reduction, he says he will have served 72% of his sentence (102 months, or 28%, of his sentence remaining).

Flenory also points out that his brother received a similar plea agreement and was sentenced to the same term of imprisonment. He says that Terry Flenory has been released by the BOP to home confinement. An email attached to Flenory's motion purportedly from the BOP confirms that Terry Flenory has been approved for home confinement on May 5, 2020. Flenory alleges that his health condition is more serious than his brother's and is simply asking to be treated

the same.

Finally, Flenory admits that he has not exhausted his administrative remedies with the BOP. Instead, Flenory, through counsel, wrote the warden at FCI Sheridan on April 17, 2020 requesting release on his behalf. Counsel explains that he took this action because Flenory informed him that the lockdown has prevented him from making the request to the BOP himself. Flenory's attorney sent a second letter to the warden on April 21, 2020 after learning of Terry Flenory's release, explaining the similar nature of their crimes and sentences and stating that Flenory's health is worse than his brother's. The BOP acknowledged receipt of the letter that same day.

According to the BOP, Flenory's medical conditions include hypertension (high blood pressure) (benign essential), hyperlipidemia (high blood cholesterol), esophageal reflux, and low back pain, as of March 30, 2020. All of these conditions are treated with a standard drug regimen. Flenory has four active prescriptions, two of which require daily ingestion. He takes one 25 mg tablet of hydrochlorothiazide for his hypertension and two 40 mg of atorvastatin for his hyperlipidemia daily. Flenory takes two other medications as needed for acid reflux and another for low back pain. And contrary to Flenory's claim otherwise, his prescriptions have been timely administered during the COVID pandemic.

Flenory's prison disciplinary record is checkered. Over the course of his incarceration, Flenory has lost a combined 135 days of Good Conduct Credit for various serious disciplinary violations, some of which resulted in placement in solitary confinement. His offenses include having a cell phone, using another inmate's prison account to purchase items at the commissary, possessing and using intoxicants, and possessing a small piece of a razor blade.

Terry Flenory's prison record differs from Demetrious's. Prison medical records show that

Terry Flenory, age 50, has hypertension, hyperlipidemia, and obesity. He is also blind in one eye due to a retinal detachment that required surgery. He takes several medications daily and has been prescribed compression stockings. Terry Flenory has an earlier release date, August 17, 2026, due to a sentence reduction from 360 to 292 months. He has therefore served more of his sentence than Flenory. Terry Flenory also has a clean prison record.

On April 22, 2020, Flenory filed an emergency motion for compassionate release, alleging that because of his age and underlying health conditions, he has a heightened risk of developing life-threating conditions if he contracted COVID-19. He also contends that he is similarly situated as his brother, and therefore he should be treated alike. The government opposes the motion, arguing, among other things, that Flenory has not exhausted the mandatory administrative procedures under the statute.

II.

Ordinarily, a "court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). There are exceptions, and one is found in the First Step Act, Pub. L. No. 115-391, which became law in December 2018. As relevant here, the First Step Act modified "the provisions for early release to halfway houses or home confinement that had been in place under the Second Chance Act of 2007." *United States v. James*, No. 15-255, 2020 WL 1922568, at *1 (D. Minn. Apr. 21, 2020) (citing 18 U.S.C. § 3624(c)(1)). That Act authorizes the BOP to place low risk prisoners in home confinement for the last six months (or ten percent, if a shorter term) of their sentence. The FSA also allows a court to reduce the term of imprisonment "after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that a reduction is consistent with applicable statements issued by the Sentencing Commission." 18 U.S.C. §

3582(c)(1)(A)(i). And on April 3, 2020, the Attorney General exercised emergency authority under section 12003(b)(2) of the CARES Act, Pub. L. No. 116-136, to expand the group of inmates who may be considered for home confinement because of the emergency conditions caused by the COVID-19 virus and its effect on prison populations. Under that guidance, "[t]he BOP began reviewing all inmates who have COVID-19 risk factors, starting with inmates incarcerated at prisons that have experienced COVID-19 cases (FCI-Oakdale, FCI-Danbury, FCI-Elkton) and similarly-situated facilities to determine which inmates are suitable candidates for home confinement." *Ibid.*

The so-called "compassionate release" provision under section 3582 of Title 18 of the United States Code allows a court to reduce a prison term "if it finds that . . . extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). But that action must await a "motion of the Director of the Bureau of Prisons," or a "motion of the defendant *after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier*." *Ibid.* (emphasis added).

Flenory acknowledges that he has not exhausted his administrative remedies. He petitioned the warden through counsel on April 17, 2020, but he waited only five days before he filed his motion on April 22, 2020. It is clear that the 30 days have not elapsed so as to trigger judicial review on the basis of an implicit denial of a petition for compassionate release. Instead, Flenory asks the Court to waive the exhaustion requirement under the circumstances.

A.

The government argues that Flenory's failure to exhaust his remedies deprives the Court of jurisdiction to entertain the motion. It does not. The Sixth Circuit has warned that attacks on

the merits should not be confounded with jurisdictional challenges, admonishing courts and parties to be more exacting when addressing challenges that are phrased as an attack on jurisdiction. *Primax Recoveries, Inc. v. Gunter*, 433 F.3d 515, 518-19 (6th Cir. 2006) ("'Clarity would be facilitated . . . if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.'") (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam), and citing *Kontrick v. Ryan*, 540 U.S. 443, 453 (2004)). The term "jurisdiction" refers specifically to "a court's adjudicatory authority." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160 (2010). Claim-processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). "[A] rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction." *Ibid.* The sure-fire way to tell the difference is to take the cue from Congress. A rule is jurisdictional only if "Congress has clearly stated that the rule is jurisdictional." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013). "[A]bsent such a clear statement," the Supreme Court has warned, "courts should treat the restriction as nonjurisdictional in character," so as to "ward off profligate use of the term 'jurisdiction.'" *Id.* There is no indication that the exhaustion requirement in section 3582 was ever meant as a condition on the Court's authority to adjudicate a compassionate release motion. It is a claim-processing rule.

B.

But that does not answer the question whether the requirement can be waived. Courts across the country are split on whether the exhaustion requirement is waivable in the midst of this

pandemic. There is now a split within this district. *Compare United States v. Alam*, No. 15-20351, 2020 WL 1703881 (E.D. Mich. Apr. 8, 2020) (Cox, J.) (exhaustion is required) *with United States v. Saad*, No. 16-20197, 2020 WL 2065476 (E.D. Mich. Apr. 29, 2020) (Hood, C.J.) (exhaustion may be excused).

Courts finding that the exhaustion requirement can be waived — mostly within the Second Circuit — follow the reasoning in *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019), which held that "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." *Washington v. Barr*, 925 F.3d 109, 119 (2d Cir. 2019). *See*, *e.g.*, *United States v. Perez*, 17-cr-513-3, 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020); *United States v. Zukerman*, No. 16-cr-194, 2020 WL 1659880, at *3 (S.D.N.Y. Apr. 3, 2020); *United States v. Colvin*, No. 3:19-cr-179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020). *See also Miller v. United States*, No. CR 16-20222-1, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020) (adopting the reasoning of *Perez*). The plaintiffs in *Washington* had sought relief under the Controlled Substantive Act (CSA), which did not contain an explicit exhaustion requirement, although court decisions had engrafted one onto the procedure for reclassification of drugs. The court held that the requirement was waivable. 925 F.3d at 119.

Other district courts, including some in this circuit, deem the exhaustion requirement unwaivable because, unlike the judge-made exhaustion rule applied to the CSA, Congress installed the exhaustion feature in section 3582. *United States v. Holden*, No. 3:13-CR-00444-BR, 2020 WL 1673440, at *9 (D. Or. Apr. 6, 2020); *see also United States v. Matthews*, No. 14-cr-20427, 2020 U.S. Dist. LEXIS 65934 (E.D. Mich. Apr. 15, 2020); *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2 (E.D. Mich. Apr. 8, 2020); *United States v. Hofmeister*, No. CV 5:16-13-KKC, 2020 WL 1811365, at *2 (E.D. Ky. Apr. 9, 2020). The Supreme Court has drawn a clear

distinction between judge-made and congressional exhaustion rules, holding that the latter may not be waived. *Ross v. Blake*, --- U.S. ---, 136 S. Ct. 1850, 1857 (2016) (citation omitted). *Compare McKart v. United States,* 395 U.S. 185, 193 (1969) ("The doctrine of exhaustion of administrative remedies . . . is, like most judicial doctrines, subject to numerous exceptions"), *with McNeil v. United States,* 508 U.S. 106, 111, 113 (1993) ("We are not free to rewrite the statutory text" when Congress has strictly "bar[red] claimants from bringing suit in federal court until they have exhausted their administrative remedies"). That view is suggested by the only court of appeals decision that has taken up the question since the pandemic outbreak. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (noting in *dictum* that the FSA exhaustion requirement "presents a glaring roadblock foreclosing compassionate release at this point").

However, the court in *United States v. Haney*, No. 19-CR-541, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.), found some flexibility in the exhaustion requirement by examining the statutory text. The court first noted that exhaustion requirements generally "serve[] the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *Id.* at *3 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)). But because the statute allows a prisoner to seek judicial review after 30 days even without an administrative determination, the first purpose is diminished in favor of a congressional preference "'for the defendant to have the right to a meaningful and prompt judicial determination of whether he should be released.'" *Ibid.* quoting *United States v. Russo*, No. 16-cr-441, 2020 WL 1862294 (S.D.N.Y. Apr. 3, 2020)). Judge Rakoff reasoned "that Congress cannot have intended the 30-day waiting period of § 3582(c)(1)(A) to rigidly apply in the highly unusual situation in which the nation finds itself today." *Ibid.* And he derived from the statutory text "that Congressional intent not only permits judicial waiver of the 30-day exhaustion period, but also, in the current extreme circumstances, actually favors such

waiver, allowing courts to deal with the emergency before it is potentially too late." *Id.* at *4.

That is a sensible reading of the statute, which has been adopted by another judge in this district. *See United States v. Atwi*, No. 18-20607, 2020 WL 1910152, at *3 (E.D. Mich. Apr. 20, 2020) (Michelson, J.). The BOP's 30-day window to address a compassionate release petition represents but a few ticks on the administrative clock — evidence of Congress's expectation of a quick turnaround before the courts get involved. "But 30 days when the statute was passed and 30 days in the world of COVID-19 are very different." *Ibid.* "Congress likely did not contemplate that a once-in-a-lifetime pandemic would lead hundreds of federal prisoners to seek compassionate release all within a four-week window." *Ibid.* The exhaustion requirement is waivable in appropriate circumstances.

C.

Courts have excused an exhaustion requirement in three instances. "First, exhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." *Washington*, 925 F.3d at 118 (citing cases). Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief." *Id.* at 119. Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." *Ibid.* Courts faced with compassionate release motions prompted by the COVID-19 pandemic focus on the third reason. Flenory does the same.

The question here is not whether Flenory should be released to home confinement (at least, not yet), but rather whether he should have to wait for the full 30 days for the BOP to act on his request. Of course, "undue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile." *Washington*, 925 F.3d at 120–21. But he has not made a convincing case

that he would suffer "undue prejudice" by waiting.

Certainly, the health risks caused by the pandemic are grave. The novel coronavirus (COVID-19) is a respiratory disease that can result in serious illness or death. It is caused by a new strain of coronavirus not previously identified in humans, and easily spreads from person to person. There is currently no approved vaccine or antiviral treatment for this disease. Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, estimated that between 100,000 and 240,000 people in the United States will die from COVID-19 related complications. Michael D. Shear *et al.*, Coronavirus May Kill 100,000 to 240,000 in U.S. Despite Actions, Officials Say, N.Y. Times, Mar. 31, 2020, https://www.nytimes.com/2020/03/31/us/politics/coronavirus-death-toll-united-states.html.

The Centers for Disease Control and Prevention (CDC) have advised that "[p]eople aged 65 years and older" may be at higher risk for severe illness from COVID-19. People Who Are at Higher Risk for Severe Illness, Centers for Disease Control and Prevention (Mar. 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The CDC also has identified persons with certain medical conditions as being at high risk, including those with "serious heart conditions." *Ibid.*

On March 23, 2020, the CDC issued further guidance acknowledging that detention facilities "present [] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, CDC (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. "The CDC noted that many detention conditions create a heightened risk [for] detainees. These include: low capacity for patient volume, insufficient quarantine space,

insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing)." *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *2 (E.D. Mich. Mar. 27, 2020).

The assessment of prejudice calls for an examination of the defendant's personal risk coupled with the environmental risks posed by his institutional setting. As for himself, he has not made any convincing case that he is at an elevated risk for contracting COVID-19. Although his hypertension puts him at a greater risk if he should become infected, that alone is not sufficient.

Flenory makes much of the fact that the BOP population has reported hundreds of COVID-19 infections. That is true. The BOP has 141,310 federal inmates in BOP-managed institutions and 10,823 in community-based facilities. The BOP staff complement is approximately 36,000. As of May 4, 2020, there were 1984 federal inmates and 356 BOP staff who have confirmed positive test results for COVID-19 nationwide. Currently, 543 inmates and 149 staff have recovered. There have been 40 federal inmate deaths and no BOP staff member deaths attributed to COVID-19 disease. However, as of yesterday, the BOP reported *no confirmed cases of COVID-19 at FCI Sheridan*. *See* BOP: COVID-19 Update, https://www.bop.gov/coronavirus/. Flenory insists that the virus lurks everywhere and points to one federal institution where universal testing has revealed a 40% infection rate. But that does not change the reality that no cases have been detected at FCI Sheridan or elevate his argument above speculation. And if circumstances change, the Court is open to receive new information.

Moreover, the administrative process is no mere formality. Since the release of the Attorney General's original memo to the Bureau of Prisons on March 26, 2020 instructing it to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP has

placed an additional 1,972 inmates on home confinement — an increase of 69.1 percent. The BOP prioritizes the cases and requires, among other things, that inmates to be released into home confinement must be quarantined "at an appropriate BOP facility" for 14 days before release. Priority for consideration is based on the following factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines.

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities.

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum.

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum.

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility.

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic, https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf. That systematic approach accounts for both personal and institutional risks.

Flenory has not shown that his condition and the institutional circumstances justify waiving the exhaustion requirement. He relies on the one case in this district where exhaustion was waived and release was granted: *United States v. Saad*. But there, the defendant had served 33 months of a 72-month sentence for a non-violent drug offense. The defendant was 71 years old and was

housed at FCI Milan, which has several confirmed cases of COVID-19. He also suffered from a host of medical conditions, including kidney disease, hypertension, pulmonary hypertension, sleep apnea, shingles, diabetes, back problems, and a frozen thigh from an overdose of coumadin given by prison officials. He also had heart surgery and knee replacement surgery. He had also recently been diagnosed with recurrent bladder cancer. The district court concluded that this combination of serious medical conditions plus the time he had served on a non-violent offense justified waiving exhaustion and reducing his sentence and release to home confinement. 2020 WL 2065476, at *6.

Flenory's circumstances are hardly as grave as Saad's. He will have to let the process run its course (as his brother did), or at least let twelve more days pass, before seeking judicial relief.

### III.

Although the Court has the authority to waive the exhaustion requirement found in 18 U.S.C. § 3582(c)(1)(A)(i), it is not appropriate to waive it in this instance. The defendant may not apply for compassionate release under the statute until the BOP adversely decides his request, or the full 30 days have lapsed since he submitted it.

Accordingly, it is **ORDERED** that the defendant's emergency motion for compassionate release (ECF No. 1616) is **DENIED WITHOUT PREJUDICE**.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Dated: May 5, 2020