UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

CRIMINAL NO. 05-80955

vs.                                    HON. DAVID M. LAWSON

D-2    DEMETRIUS FLENORY,

Defendant.

_____/

**United States' Response Opposing
the Defendant's Motion for Compassionate Release
or Request for Home Confinement**

Demetrius Flenory is currently serving a 30 year sentence for running the Black Mafia Family (BMF), one of the largest drug trafficking and money laundering organizations in this district.  Flenory does not have any CDC risk factors for risk of severe illness from COVID-19.  The Bureau of Prisons has denied his request for compassionate release under the stringent standard in 18 U.S.C. § 3582(c)(1)(A) because Flenory failed to demonstrate "extraordinary or compelling reasons" warranting a reduction in sentence.  Flenory now renews a motion for compassionate release before this Court. His motion should be denied because given

1

Flenory's age, health and danger to the community, compassionate release is not appropriate.

## Background

Flenory and his brother started selling crack cocaine in Ecorse, Michigan in the 1990's. (PSR ¶ 13). Flenory negotiated and saw through the purchases of bulk quantities of cocaine. Under his leadership, BMF would eventually grow to employ an estimated 500 employees who served as managers, couriers, money launderers and the like who insulated Flenory from direct involvement in the drug transactions. (PSR ¶¶ 13, 15; *see also* Doc. #1632: Opinion and Order at 2).  Weekly shipments of 100 kilograms of cocaine were distributed on the streets of Detroit and in several other cities. (PSR ¶¶ 13-14). Flenory made millions. With the wealth generated from BMF's drug sales, Flenory purchased jewelry, luxury cars, and mansions in multiple cities. (PSR ¶ 17). Flenory further promoted BMF's illegal activities under the guise of a music production company known as BMF Entertainment, which was nothing more than a front organization to conceal the true source of the cash and other assets that Flenory flaunted.

Following a years-long, coordinated multi-jurisdiction investigation involving wiretaps and other sophisticated techniques, Flenory and 66 other BMF members were arrested in this district, while numerous other BMF members were

arrested and prosecuted in multiple other districts.[1] The government seized over $21 million in assets.

Flenory eventually pleaded guilty to continuing criminal enterprise and money laundering. (PSR ¶ 9).  His sentencing guidelines range was 360 months to life. (PSR ¶ 70).

Flenory began serving his sentence on September 12, 2008.  He is currently incarcerated at Sheridan FCI in Sheridan, Oregon.  To date, there are no known cases of Covid-19 at Sheridan. Flenory is 51 years old, and his projected release date is October 30, 2031. According to BOP, Flenory has served approximately 48% of his sentence. Exhibit 1 (sealed).  His only underlying medical conditions are hypertension (benign essential), hyperlipidemia, esophageal reflux and low back pain. Exhibit 2 and Exhibit 3, Medical Records (sealed). Nevertheless, Flenory has moved for compassionate release, citing his underlying medical conditions and the Covid-19 pandemic.

## Procedural History

On April 17, 2020, Flenory's attorney sent the warden at Sheridan a request for compassionate release pursuant to 18 U.S.C. § 3582 (c)(1)(A), on Flenory's behalf.  Five days later, on April 22, 2020, Flenory filed an emergency motion for

---

[1] BMF was prosecuted under two separate indictments in this district, *United States v. Terry Flenory, et al*, Case No. 05-80955 and *United States v. Derrick Armstrong, et al*, Case No. 06-20663.

compassionate release or alternatively a request or recommendation for home confinement with this Court. (Doc. #1616). The government responded that the Court should require Flenory to exhaust his administrative remedies before addressing the merits of Flenory's request for compassionate release. (Doc. #1624). This Court agreed.  And on May 5, 2020, this Court issued an order denying without prejudice Flenory's emergency motion for compassionate release, finding that Flenory should exhaust his administrative remedies with the Bureau of Prisons first. (Doc. #1632).

On May 18, 2020, BOP denied Flenory's request for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) based on Flenory's concerns about COVID-19.  *See* Exhibit 4 (sealed).  In support of its finding, BOP advised Flenory "your concern about being potentially exposed to, or possibly contracting, COVID-19 does not warrant an early release from your sentence." *Id*.

Flenory now renews his motion for compassionate release before this Court. Flenory asks this Court to reduce his sentence to time served or alternatively, place him on home confinement or on supervised release. (Doc. #1634).  Although Flenory has now exhausted his administrative remedies, Flenory does not qualify for compassionate release. His motion should be denied.

4

## Argument

Flenory's medical conditions do not present extraordinary or compelling reasons for compassionate release. Flenory's medical conditions include hypertension (benign essential), hyperlipidemia, esophageal reflux, and low back pain, all for which he is being treated with medication. Flenory is not elderly, and he does not have any CDC risk factors that would put him at a heightened risk of severe illness from Covid-19. Flenory is also a danger to the community, which, makes him ineligible for compassionate release, and the § 3553 factors further demonstrate that compassionate release for Flenory is inappropriate.

As he did in his first motion, Flenory continues to demonstrate a fundamental misapprehension of the distinctions between a reduction in sentence under 18 U.S.C. § 3582 and the BOP's home placement program. BOP's home confinement decisions are guided by BOP policy, while compassionate release is governed by statute and the sentencing guidelines. By confusing the two remedies, Flenory invites this Court to replace the stringent compassionate release standard with the flexible regulations used by BOP to determine an inmate's place of confinement. The Court being well aware of the difference between the two remedies, should firmly decline Flenory's invitation.

I.      **The Court should deny Flenory's motion for compassionate release.**

Flenory continues his attempts to water down compassionate release to include Flenory, an inmate with no CDC risk factors, but a generalized risk from coronavirus.  Flenory's motion for a reduced sentence should be denied.

A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001).

Compassionate release is a drastic remedy that allows a sentencing court to modify an inmate's sentence only for "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A).  The government set forth the standards for compassionate release in its prior brief in response to Flenory's first motion for compassionate release, and continues to rely on that analysis here. (Doc. #1624 at 17-24). As described in the government's prior response brief, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within the categories outlined in § 3582(c)(1)(A). *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *3 (10th Cir. March 26, 2020). And release must

6

be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

The First Step Act did not amend the substantive requirements for release. *Saldana*, 2020 WL 1486892, at *2–*3; *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding, and to qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community." USSG § 1B1.13(2).

Even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just

punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

**A.    There are no extraordinary and compelling reasons to grant Flenory compassionate release.**

Compassionate release for Flenory would be improper.   Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. As described in the government's prior response brief, the Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Flenory and other inmates. Thus, as the Third Circuit has explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's

8

statutory role, and its extensive and professional efforts to curtail the virus's spread."
*Raia*, 954 F.3d at 597.

Flenory's age and medical condition, likewise, do not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the Covid-19 pandemic.  At 51 years old, Flenory is not of advanced age.  He is not suffering from a terminal illness or a serious permanent physical or mental condition that substantially diminishes his ability to provide self-care.  And Flenory has no minor children. Flenory's age and medical records also confirm that he does not face a heightened risk from Covid-19.  His only underlying medical conditions are hypertension (benign essential), hyperlipidemia, esophageal reflux, low back pain, all of which are under treatment by prescription drugs.

Flenory claimed in his first motion that his hypertension placed him at high risk. He now claims, in addition to having hypertension, that he is obese with a BMI of 30.4, presumably because this Court considered Terry Flenory's morbid obesity when distinguishing his circumstance from Flenory's. However, neither Flenory's hypertension nor Flenory's level of obesity are CDC risk factors. The CDC has found that the following underlying medical conditions place individuals at a risk of severe illness from Covid-19: serious heart conditions, the immunocompromised, severe obesity (defined as BMI of 40 or higher), diabetes, chronic kidney disease,

and liver disease. <u>CDC Website, People at Higher Risk.</u> This list does not include regular hypertension or obesity at levels less than a BMI of 40.

First, not all hypertension is the same. The CDC lists "pulmonary hypertension" as a "serious heart condition" that may place individuals at greater risk. And contrary to Attorney Wade Fink's assertion otherwise, all hypertension is not pulmonary. Exhibit 5: Motion Hearing Transcript at 34. Rather pulmonary hypertension is a type of high blood pressure that affects the arteries in your lungs and the right side of your heart. *See* https://www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc-20350697. Whereas, regular hypertension affects other arteries in the body.

Flenory does not have pulmonary hypertension, and with a diagnosis of hypertension (benign essential), there is no reason to believe his hypertension is more than garden-variety high blood pressure. Despite this, he argues that his high blood pressure puts him at risk. But as Judge Levy recently noted, "at best, the evidence regarding non-pulmonary hypertension is unclear." *Malam, et al v. Alducci*, 20-10829 (E.D. Mich. May 12, 2020), at 22.

And neither does the CDC identify obesity, at the level Flenory now claims he has as posing a heightened risk of complications from Covid-19. First, Flenory's medical records do not reflect that he suffers from obesity. Even assuming he does, a BMI of 30.4, might be "medically obese," but, relatively, not by much, and it is

overwhelming less obese than the CDC identifies (BMI of 40 or higher) as a risk factor for severe complications from Covid-19.

So whether considered alone or in combination with the Covid-19 pandemic, Flenory's age and medical condition do not satisfy the initial eligibility criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15, 2020); *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020).

Further, although a defendant's heightened risk from Covid-19 in prison might, in some circumstances, satisfy the medical or age criteria in USSG § 1B1.13 cmt. n.1, Flenory's circumstances cast doubt on whether that is true here. The *average* person may have a higher relative risk of contracting Covid-19 in prison than if released among the public at large. But § 1B1.13 requires an *individualized* assessment, and an individual defendant's relative risk varies widely. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *4–*5 (E.D. Mich. May 15, 2020). It depends on the precautions at his prison, the number of Covid-19 cases there, whether and how much that number might increase or decrease, the prison's medical facilities, the defendant's release plan, the threat from Covid-19 in his release location, his access to medical care if released, and his willingness to abide by release restrictions and social-distancing protocols. *See id.*

11

Finally, even if the combination of Flenory's medical conditions and the Covid-19 pandemic satisfied the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, Flenory would remain ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent" offenders—such as those who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2); *see Stone*, 608 F.3d at 948 n.7; *United States v. Israel*, No. 17-20366, 2017 WL 3084374, at *5 (E.D. Mich. July 20, 2017) (recognizing that "economic harm may qualify as a danger" foreclosing release).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities,

including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Flenory's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). As the Court has already noted, Flenory has an extensive criminal history. *See* Opinion and Order at 2. Flenory has numerous contacts with law enforcement.  Prior to his arrest on this case, he had been arrested 12 times on charges which include drugs, weapons, and assaultive offenses. In addition to the indictment in this case, he had three other pending charges:  murder, forgery/giving a false name to police and felon in possession of a firearm. Flenory has been arrested on charges involving firearms on four occasions. He has been arrested on drug charges four times. He had five Social Security numbers, fours alias birthdates and five alias names. (PSR at 3). Flenory led one of the largest drug trafficking organization in this district's history.  It spanned over numerous states, ravaging communities with its massive distribution of cocaine. The violence, some of which fatal, associated with BMF and BMF Entertainment itself, is well documented in police reports, on BMF's Wikipedia page, as well as in a three-part series, in-depth report on BMF entitled *Hip-Hop's*

13

*Shadowy Empire* by then senior editor of Creative Loafing Magazine, Mara Shalhoup, who also interviewed Flenory and attended his sentencing. *See* Exhibit 6 (sealed) and Exhibit 7. Shalhoup would later publish a book on the organization, assisted in part by Flenory himself, entitled BMF: *The Rise and Fall of Big Meech and the Black Mafia Family.*

The government notes that Flenory has provided several letters of support from a community leader, an elected official and other citizens, all of whom suggest that he is a "role model" who should be released. These letters belie Flenory's own words which establish just the opposite. In Flenory's mind, "it's still funny today how every entertainer, athlete or whatever, everybody want to live like they selling kilos …, cause that's the real American dream. Everybody want to live like they sell dope or they sold dope." Because for Flenory, "[r]espect come from the ground up. You don't get that respect just 'cause you get an entertainment check . . . [t]hat, respect is earned."[2] In fact, rather than respecting those earning a legitimate source of income, "Scarface inspired [Flenory]. . . and [t]hat's the problem now. That's why we got so many rats . . . all the real [N-word] is doin' thirty plus and uh, all the rats[cooperating witnesses] at home." *See* Exhibit 8 at 2. And, of course Flenory is

---

[2]  In 2011, Flenory participated in an interview with Cavario H. Here for VLADTV.  These interviews can be found at https://www.youtube.com/watch?v=n2cfY58hMso https://www.youtube.com/watch?v=5gQlJ9IFvqI. Transcripts of these interviews are included in Exhibits 8 and 9.

referring to himself as a real one because he was sentenced to 30 years' imprisonment for his crimes and several witnesses provided evidence in support of the government's case against him.

Since Flenory has presented no evidence of his rehabilitation, the Court can only rely on Flenory's own words. And Flenory has made clear that he still relishes the key role he played in this large scale drug organization and in the money he made from his drug sales:

> But they don't get it because I mean, you know, they say the game is to be sold not told.  So that ain't something I sat down. I ain't sat down and told them look you got to be making millions and billions of dollars underground to be able to go out and do this from state to state, city to city like I'm doing.  You know what I'm saying?  These dudes ain't never met nobody like me that live in Houston and Dallas, uh, uh, St. Louis and Atlanta, LA.  You know what I'm saying?  And then you got uh, uh, in Florida both in Orlando and Miami and I got several houses in each spot.  Several homes and condos.  They ain't used to that.  They ain't never seen no black.  If you told them that a black man was living like that and doing what I was doing.  They think you was lying.  You know what I'm saying?  They think you lying.  Puff, [Sean "Puffy" Combs] none of them was more.  Puffy, nobody and I love Puff to death.  None of them was more liquid than me.  You know what I'm saying?  Like more liquid.  I can go grab a million dollars, throw it out the car and goddamn-it go grab a couple more with no problem.

Exhibit 9 at 6.

Flenory is simply not eligible for compassionate release.

**B.    The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.**

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Flenory eligible for compassionate release, the § 3553(a) factors should still disqualify him.

In addition to the forgoing, Flenory is a professional drug dealer, who was one of the leaders of a significant, years' long conspiracy to move large quantities of cocaine and the cash from its sale. This was no ordinary crew of street level drug dealers. It is estimated that BMF employed 500 members. It was highly successful for years. And it would not have run without Flenory's leadership. Because of this, Judge Cohn sentenced Flenory to 30 years' imprisonment. Due to the advisory

16

nature of the sentencing guidelines, Judge Cohn could have sentenced Flenory to a mandatory minimum sentence of 20 years in prison for continuing criminal enterprise. But, because "it[] had gone on for over ten years, maybe 15 years," and Judge Cohn thought Flenory was "a very lucky man that it took the government that long to finally put it together," Judge Cohn imposed a sentence of 30 years' imprisonment. *See* Doc.#1101 PgID 63; Doc.#1162, PgID 6799.

And Flenory is no "hip hop mogul." He did not describe himself as such when probation interviewed him in 2008. At 38, he had no employment history at any point in his adult life. He claimed to have earned no income from his ownership of BMF Entertainment or his part-ownership of Juice Magazine. (PSR ¶¶ 63, 64). This is because neither of these entities generated funds legally. They were sourced from proceeds of Flenory's drug enterprise. In fact, BMF Entertainment had not even been established until March 4, 2004, less than 2 years before Flenory was arrested in this case. Exhibit 10: BMF Entertainment Articles of Incorporation. Its registered agent was BMF Entertainment's sole "rap artist" who was a BMF member who was convicted of drug conspiracy in the Atlanta BMF prosecution. And neither BMF Entertainment nor Flenory filed any tax returns.

And contrary to Flenory's assertion otherwise, he has made no voluntary payments toward the $270 million money judgment, despite having $9,103.73 in his prison account and having retained two separate counsels to handle his legal matters

within the last two years. *See* Exhibit 11 (sealed). All adjustments to Flenory's money judgment were applied as a result of the significant assets the government seized and Flenory forfeited in this case.

In his papers, Flenory claims growing up in extreme poverty with his loving family, in a house in proximity to pollutants, led to his life of crime. (Defendant's Brief at 21). According to Flenory, his father's life was confined to work and to church, and Flenory wanted to "lift up loved ones from poverty and help communities by providing food and other items to those in need." (Defendant's Brief at 23). Flenory's description of his father is far different from the one he gave probation when he was interviewed. (PSR ¶ 54). More importantly, Flenory used his father, Charles Flenory, to facilitate his money laundering schemes.[3] *See* Exhibit 12 (sealed). In fact, Charles Flenory served as a nominee on the very first house the Flenory brothers purchased in Decatur, Georgia, for $115,000, in October 1990, bringing a "wad of cash" to the closing, much to the surprise of the home's seller. *See* Exhibit 13 (sealed).

And at no point when Flenory was making and spending the millions of dollars that he earned from his cocaine sales and while purchasing luxurious houses in various cities, did he ever remove his mother from the home that he suggests

---

[3] Charles Flenory was charged with money laundering in this case. On September 10, 2007, he pleaded guilty to money laundering and was sentenced to 18 months' imprisonment. *See* Exhibit 14 (sealed) and Exhibit 15.

harms her now. It is also the same home that fostered the Flenory brothers' start in the drug business.  They stored cocaine and cash and processed crack cocaine there. *See* Exhibit 16 (sealed).

Flenory has not demonstrated remorse or shown that he is rehabilitated.  Even if he had, rehabilitation is not, by itself, an extraordinary or compelling reason to reduce his sentence. USSG § 1B1.13 cmt. n.1(B).

Finally, Flenory's claim that reducing his sentence would avoid a sentencing disparity between him and his brother is simply not true.  In fact, it would create one to the detriment of Terry Flenory *not* Flenory, as described further below. In addition, whether or not Terry Flenory was moved to home confinement by BOP does not change the very different analysis this Court must follow in deciding whether to grant Flenory the separate relief of compassionate release.

BOP release to home confinement and court-ordered compassionate release are two different remedies with very different standards. Both reduce the federal prison population and can mitigate some of the risks that the novel coronavirus poses to the incarcerated, but comparing inmates that the BOP places on home confinement to inmates who have filed compassionate release motions is an irresponsible rejection of the standards set forth in 18 U.S.C. § 3582(c)(1)(A) and USSG § 1B1.13.

**Home confinement**. The Bureau of Prisons has the authority to determine a prisoner's place of confinement. 18 U.S.C. §§ 3621, 3624. In normal times, the BOP may place a prisoner in home confinement only for the last 10 percent of the term of imprisonment, or six months, whichever is shorter. 18 U.S.C. § 3624(c)(2). But on March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) changed this landscape. Under the CARES Act, "if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement." Pub. L. No. 116-136, 516 § 12003(b)(2), 134 Stat. 281 (2020). On April 3, 2020, the Attorney General made that finding, and authorized the BOP director to immediately maximize transfers to home confinement of all appropriate BOP inmates. April 3, 2020, Attorney General Memo to Director of BOP. In response to AG Barr's directive, the BOP began reviewing all inmates to determine which cases were suitable for home confinement. As of May 27, 2020, the BOP has placed 3,311 inmates on home confinement. BOP Coronavirus Website. The factors for eligibility for BOP-ordered home confinement are set forth in BOP guidance and regulations. On May 8, 2020, a BOP memo identified the factors it would use to assess the suitability of an inmate for home confinement during the pandemic. Exhibit 17, May 8, 2020, BOP Memo.  Those factors include the inmate's disciplinary history, release

plan, nature of offense, security level, and "age and vulnerability of the inmate to COVID-19, in accordance with CDC guidelines." (*Id.*)

Inmates placed on home confinement by the BOP do not have their sentences reduced or modified. Only the inmate's place of confinement changes. While on home confinement, such inmates remain in the custody of the BOP and can be returned to more restrictive custody under certain circumstances. BOP Program Statement 7320.01, *Home Confinement*. Because home confinement transfer decisions, like all place-of-confinement decisions, are within the sole discretion of the BOP and guided by BOP policy, the U.S. Attorney's Office does not have a role in evaluating inmates for home confinement. Instead, the BOP provides notice to the appropriate U.S. Attorney's Office after decisions are made regarding specific inmates.[4]

**Compassionate Release**. An inmate's federal sentence can be reduced only by a judge. Compassionate release, which is governed by 18 U.S.C. § 3582(c)(1)(A), allows the Court to modify a defendant's sentence. Because it is an exception to the

---

[4] In rare cases, the U.S. Attorney's Office may be asked whether it has additional information to provide for use by the BOP in its independent consideration, but even in those cases, the BOP retains complete discretion to grant or deny transfer to home confinement. In this case, the U.S. Attorney's Office was neither contacted by nor provided any information to BOP during its assessment of Terry Flenory's eligibility for BOP home confinement. In fact, the government learned of Terry Flenory's change-of-placement when Flenory filed his first motion for compassionate release.

important legal principle respecting the finality of sentences, compassionate release is only available in a very limited set of circumstances: where there are both extraordinary and compelling reasons—which are defined by the Sentencing Commission in Application Note 1 to USSG § 1B1.13, pursuant to Congressional delegation—and no risk that the inmate is dangerous. Inmates granted compassionate release have their sentences modified by the Court. The inmate's term of imprisonment can be replaced with a new period of supervised release (which can have home confinement as a condition), or the inmate can be released altogether. Because compassionate release is a reduction in sentence, such motion can only be granted by the sentencing court, and the U.S. Attorney's Office has an opportunity to take a position.

The BOP's ability to place inmates on home confinement is frequently conflated with compassionate release. Perhaps the confusion is due to the BOP's gatekeeping role in compassionate release petitions. With the First Step Act, Congress kept the requirement that compassionate release petitions must first be submitted to the BOP, but allowed inmates to seek relief directly from the court in the event of a final refusal from the BOP, or in any case after waiting 30 days. 18 U.S.C. § 3582, 28 C.F.R. § 571.61. The BOP considers inmates for compassionate release using the § 1B1.13 application notes and BOP Program Statement 5050.50.

Ultimately, the decision to grant compassionate release remains with the sentencing court, despite the BOP's continued gatekeeping role.

Despite these differences between the BOP's home confinement program and compassionate release, Flenory continues to argue that the Court should grant him compassionate release because his brother was placed in home confinement by BOP. Flenory also continues to compare his case to his brother's by advancing that his health conditions and circumstances are identical to his brother's. And Flenory has asked this Court to place him in home confinement if this Court is not persuaded that he is entitled to compassionate release.

This Court has already demonstrated its familiarity with the criteria that BOP uses to place inmates on home confinement (*See* Doc. #1632: Opinion and Order at 13). Based on that familiarity, this Court also recognized the factors that distinguished Terry Flenory's case from Flenory's in terms of underlying medical conditions, percentage of time served on the sentence, and Terry Flenory's conduct while in prison. *Id.* at 4. While BOP's home confinement factors are distinct from the requirements for compassionate release applicable here, the government notes that, even taking a conservative approach, Flenory fails to satisfy 3 of 6 BOP criterion for priority placement on home confinement. At 51 years old with none of the CDC risk factors for risk of severe illness from Covid-19, Flenory fails to satisfy BOP's age and vulnerability to Covid-19 factor. Flenory is incarcerated in a medium

security, rather than a low or minimum facility, which is another factor BOP uses to assess eligibility. *See* https://www.bop.gov/locations/institutions/she/. In addition, Flenory's PATTERN score is above minimum, which also excludes him from being prioritized for home placement. *See* Exhibit 18 (sealed). And this analysis does not take into account Flenory's conduct while in prison, which this Court has already noted has been "checkered." But, BOP also considers the inmate's crime of conviction and it assesses the inmate's danger to the community.

Additionally, as stated above, if this Court were to grant Flenory's motion, it would in fact create, rather than alleviate, a disparity in sentence. Terry Flenory is still under sentence for the remainder of his sentence, and, BOP has the authority to return him to prison should he violate any of the conditions of home confinement. If this Court were to reduce Flenory's sentence to time served, on the other hand, Flenory would be relieved of his remaining sentence, and BOP would be deprived of the authority to take measures to protect the community from Flenory. And unless this Court reduces Flenory's sentence, which for the reasons stated would be improper here, the Court lacks the authority to order Flenory placed on home confinement. *See Tapia v. United States*, 564 U.S. 319, 331 (2011); *see, e.g., United States v. Curry*, 2019 WL 508067, at *1 (E.D. Ky. 2019).

The § 3553(a) factors, including Flenory's history and characteristics, seriousness of the offense, promoting respect for the law, and providing just punishment weigh in favor of denying his request for compassionate release.

## II. If the Court were to grant Flenory's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Flenory's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

### Conclusion

Flenory's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney


*s/Dawn N. Ison*
DAWN N. ISON
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9567
dawn.ison@usdoj.gov

Dated:  May 28, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to:

Wade G. Fink
Attorney for Demetrius Flenory


I further certify that I served a copy of the Government's sealed Exhibits via email to:

Wade G. Fink
Attorney for Demetrius Flenory


*s/Dawn N. Ison*
DAWN N. ISON
Assistant United States Attorney

Dated: May 28, 2020